UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

U.S. DISTRICT COURT

2009 DEC -9 P 3: 07

| | |
|---|---|
| EMERGENCY PHYSICIANS OF ST. CLARE'S, LLC; MERCER BUCKS ORTHOPEDICS, PC; AND PASCACK EMERGENCY SERVICES,<br><br>On behalf of themselves and all others similarly situated,<br><br>             **Plaintiffs,**<br><br>        **v.**<br><br>**PROASSURANCE CORPORATION; PROASSURANCE CASUALTY COMPANY; AND PROASSURANCE INDEMNITY COMPANY, INC.,**<br><br>            **Defendants.** | Civil Action No.     *09-6244 (WJM)*<br><br>**COMPLAINT**<br><br><br>*(Document electronically filed)* |

Plaintiffs on behalf of themselves and on behalf of all others similarly situated, for

their complaint against defendants ProAssurance Corporation ("ProAssurance"),

ProAssurance Casualty Company ("ProAssurance Casualty"), and ProAssurance

Indemnity Company, Inc. ("ProAssurance Indemnity"), allege as follows:


## I. NATURE OF THE ACTION

1.  This is a class action seeking redress for defendants' practice of charging an

unlawfully high price for endorsements to medical malpractice insurance policies that

defendants sold to their policyholders who were either cancelled or non-renewed, or who

voluntarily terminated their coverage.

2.  Most malpractice insurance policies sold today are "claims-made" policies.

Claims-made policies cover the policyholder for a claim made (i.e., reported) during the

policy year.  The policies cover liability that may arise from an incident of malpractice

that is reported during the policy year, so long as the policyholder was insured by the company when the alleged incident of malpractice occurred. They do not, however, cover alleged incidents of malpractice that occur during the policy year but that are reported after the policy year, unless the policyholder purchases an endorsement to the policy to cover claims for injuries that occurred between the inception date of the policy--known as the "retroactive date"--and the policy's termination date, but that are not reported until after the termination date. Such an endorsement is essential to the policy and is called an Extended Reporting Period or "ERP" endorsement, and is also known as "tail" coverage.

3. An endorsement is an amendment to an existing policy that changes the terms of the policy and becomes part of the policy. Policies frequently include endorsements. Some endorsements provide additional coverage that is not provided under the terms of the initial policy. Other endorsements exclude coverage that is provided under the terms of the initial policy. An ERP endorsement neither adds nor excludes coverage during the policy period but instead extends the time period during which a policyholder may report a claim arising during the policy period and still be covered.

4. The policies defendants sold to plaintiffs provided that if plaintiffs' coverage were terminated plaintiffs had the right to buy an ERP endorsement. The policies did not set forth a specific price plaintiffs would be required to pay, but rather variously stated:

a. The ERP premium will be computed "in accordance with Pro National's rules in effect on the termination date."

b. The ERP premium will "be computed in accordance with our rules, rates, rating plan and premiums applicable on the effective date of the endorsement."

c. The ERP premium "will be determined in accordance with the   Rates and Rules in effect at the time the Reporting Endorsement is issued."

5. The rate for plaintiffs' ERP endorsements in effect on the termination date, on the endorsement issuance date and on the effective date of the endorsement were the rates set forth in the rate filing governing the terminating policy. Nevertheless, for policies terminating in 2003, 2004 and 2005, defendants charged plaintiffs the rate applying to ERP endorsements attaching to policies written after plaintiffs' policies terminated.   That rate was substantially higher than the rate defendants had filed that applied to plaintiffs' ERP endorsements.

6. This action is brought by plaintiffs as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of former policyholders of defendants who purchased ERP endorsements from defendants and were charged the rate defendants had filed for ERP endorsements covering claims arising after the termination of plaintiffs' policies, rather than the rate they had filed for ERP endorsements covering claims arising during the term of plaintiffs' policies.

7. Plaintiffs bring this action on behalf of two separate classes: (1) the class of all former New Jersey policyholders of defendants terminating during 2003, 2004 or 2005 who purchased ERP endorsements from defendants and were charged the rate defendants had filed for ERP endorsements covering claims arising after the termination of plaintiffs' policies, rather than the filed rate for ERP endorsements pertaining to plaintiffs' policies; and (2) the class of all former policyholders of defendants terminating during 2003, 2004 or 2005 who purchased ERP endorsements from defendants and were charged the rate defendants had filed for ERP endorsements covering claims arising after the termination

4

of plaintiffs' policies, rather than the filed rate for ERP endorsements pertaining to plaintiffs' policies.

8.  Plaintiffs seek relief at law and in equity for the unlawful conduct engaged in by defendants.

## II. JURISDICTION AND VENUE

9.  This court has jurisdiction over this action pursuant to 28 U.S.C. §1332, which confers original jurisdiction of all civil actions upon District Courts where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

10.  The amount in controversy, without interests and costs, exceeds the sum or value of $75,000.  Plaintiffs are all citizens of the State of New Jersey.  Defendant ProAssurance is incorporated in the State of Delaware, has its principal place of business in the State of Alabama and is a citizen of the states of Delaware and Alabama. Defendant ProAssurance Casualty is incorporated in the State of Michigan, and has its principal place of business in the State of Alabama, and is a citizen of the states of Michigan and Alabama.  Defendant ProAssurance Indemnity is incorporated in the State of Alabama, has its principal place of business in the State of Alabama, and is a citizen of the State of Alabama.

11.  Venue in this case is founded on 28 USCS § 1391.  Venue is proper because a substantial part of the events giving rise to plaintiffs' claims occurred in this District. In addition, defendant ProAssurance regularly does business in this District through its

5

operating company ProAssurance Casualty, which also regularly does business in this District.

## III. THE PARTIES

### Plaintiffs

12.  Plaintiff Emergency Physicians of St. Clare's, LLC, ("EPSC") is a group medical practice located at 25 Pocono Road in the Town of Denville in the County of Morris in the State of New Jersey.  EPSC is a limited liability corporation incorporated under the laws of the State of New Jersey with its principal place of business in the State of New Jersey.

13.  Plaintiff Mercer Bucks Orthopedics, PC, ("MBO") is a group medical practice located at 3120 Princeton Pike in the Town of Lawrenceville in the County of Mercer in the State of New Jersey.  MBO is a professional corporation incorporated under the laws of the State of New Jersey with its principal place of business in the State of New Jersey.

14.  Plaintiff Pascack Emergency Services ("PES") is a group medical practice located at 250 Old Hook Road in the Town of Westwood in the County of Bergen in the State of New Jersey.  PES is a subchapter S corporation incorporated under the laws of the State of New Jersey with its principal place of business in the State of New Jersey.

### Defendants

15.  Defendant ProAssurance is an insurance company located at 100 Brookwood Place in the Town of Birmingham in the County of Jefferson in the State of Alabama.

Defendant ProAssurance is incorporated under the laws of the State of Delaware with its principal place of business in the State of Alabama. ProAssurance is the fifth largest writer of medical malpractice insurance in the United States. According to its website, in 2008 it had total assets of $4.3 billion, total revenues of $567 million, and net income of $178 million. Defendant ProAssurance operates through its operating companies in 48 states and the District of Columbia, and has 23 offices throughout the United States. It writes medical malpractice insurance through six operating companies:

    a. ProAssurance Indemnity, Inc. (formerly known as Medical Assurance Company, Inc.);

    b. ProAssurance Casualty (formerly known as ProNational Insurance Company);

    c. ProAssurance National Capital Insurance Company (formerly known as NCRIC, Inc.);

    d. ProAssurance Wisconsin Insurance Company (formerly known as Physicians Insurance Company of Wisconsin, Inc.);

    e. ProAssurance Specialty Insurance Company, Inc. (formerly known as Red Mountain Casualty Insurance Company, Inc.); and

    f. the Podiatry Insurance Company of America.

16. Defendant ProAssurance Indemnity is ProAssurance's largest operating company and is located at 100 Brookwood Place in the Town of Birmingham in the County of Jefferson in the State of Alabama. Defendant ProAssurance Indemnity is incorporated under the laws of the State of Alabama with its principal place of business in the State of Alabama. In 2008, ProAssurance Indemnity accounted for 55% of

7

ProAssurance's gross written premium. In 2008, ProAssurance Indemnity wrote $259 million in premium. Its ratio of incurred losses to earned premiums--its estimate of the amount it would pay out in claims divided by the premium it earned--was 12.4%. In 2008, ProAssurance Indemnity wrote 95% of its business in eight states: Alabama, Arkansas, Indiana, Maryland, Missouri, Ohio, Tennessee, and Virginia.

17. Defendant ProAssurance Casualty is ProAssurance's second largest subsidiary and is located at 100 Brookwood Place in the Town of Birmingham in the County of Jefferson in the State of Alabama. Defendant ProAssurance Casualty is incorporated under the laws of the State of Michigan with its principal place of business in the State of Alabama. In 2008, it accounted for 28% of ProAssurance's gross written premium. In 2008, ProAssurance Casualty wrote $134 million in premium. Its ratio of incurred losses to earned premiums was 39.8%. In 2008, ProAssurance Casualty wrote 94% of its business in six states: Delaware, Florida, Illinois, Kentucky, Michigan, and New Jersey.

18. Defendants ProAssurance, ProAssurance Casualty, and ProAssurance Indemnity have the same chairman, W. Stencil Starnes. In addition, the officers and directors or trustees of ProAssurance Casualty and ProAssurance Indemnity are substantially identical. ProAssurance uniformly directs ProAssurance Casualty and ProAssurance Indemnity, and uniformly applies the same policies with respect to ProAssurance Casualty and ProAssurance Indemnity.

19. ProAssurance uses the slogan "Treated Fairly," has entitled its 2008 Annual Report "Treated Fairly," and sets forth its "Treated Fairly" pledge on its website. Among other things, ProAssurance says that its "Treated Fairly" pledge means that policyholders

8

can be clear about their professional liability coverage, and that they can expect an uncommon level of transparency from ProAssurance.

## IV.  CLASS ALLEGATIONS

20.  This action is brought as a class action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure.  Plaintiffs bring this action on behalf of two different classes.  The first class ("Class I") consists of all former New Jersey policyholders of defendants terminating during 2003, 2004 or 2005 who purchased ERP endorsements from defendants and were charged the rate defendants had filed for ERP endorsements covering claims arising after the termination of plaintiffs' policies, rather than the filed rate for ERP endorsements pertaining to plaintiffs' policies.  The second class ("Class II") consists of all former policyholders of defendants terminating during 2003, 2004 or 2005 who purchased ERP endorsements from defendants and were charged the rate defendants had filed for ERP endorsements covering claims arising after the termination of plaintiffs' policies, rather than the filed rate for ERP endorsements pertaining to plaintiffs' policies.

21.  This action is properly brought as a class action for the following reasons:

a.  The joinder of either all Class I members or all Class II members in one action is impracticable, and the disposition of the claims of the members of both classes in a class action will provide substantial benefit to both the parties and the Court.  The number of members of either class is unknown but can be readily determined from defendants' records.

b.  There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented.  The questions of law and fact

common to the class members predominate over questions that may affect individual class members, including the following:

(1) Whether defendants calculated the premium for the ERP endorsement as they promised to calculate it in their policies and rate filings;

(2) Whether defendants are required to charge their insureds the rates they have filed with state insurance departments;

(3) Whether the policy provisions providing that the premium for the ERP endorsement must be calculated "in accordance with our rules, rates, rating plan and premiums applicable on the effective date of the endorsement" or "in accordance with ProNational's rules in effect on the termination date" permit defendants to charge plaintiffs the rate defendants have filed for ERP endorsements which provide coverage for claims arising after the expiration of plaintiffs' policies;

(4) Whether plaintiffs are entitled to the difference between the premium they paid for their ERP endorsement and the premium they would have paid had defendants charged them the rate they had filed for plaintiffs' ERP endorsements;

(5) Whether the arbitration clause contained in the Pro Assurance Casualty policy is enforceable;

c. Plaintiffs are asserting claims that are typical of the claims of Class I as a whole and Class II as a whole, because plaintiffs purchased ERP endorsements from defendants and were charged the rate filed for ERP endorsements that cover claims arising after the termination date of plaintiffs' policies, rather than the rate filed for ERP endorsements pertaining to their policy, which covers claims arising on or before the termination date of plaintiffs' policies.

d. Plaintiffs will fairly and adequately represent and protect the interests of both Class I and Class II in that they have no disabling conflicts of interest that would be antagonistic to those of other class members.

e. Plaintiffs have retained counsel who are competent and experienced in the prosecution of class action and insurance litigation.

f. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(1) Claims of all class members can be determined by this Court;

(2) This action will cause an orderly and expeditious administration of the class claims;

(3) This action will result in economies of time, effort and expense;

(4) This action will insure uniformity of decision.

(5) Without a class action, defendant will continue to retain the fruits of its wrongful conduct;

(6) This action presents no difficulties that would impede its management by the Court as a class action.

g. Defendants have acted or refused to act on grounds that apply generally to both classes, so that final relief is appropriate respecting the classes as a whole.

## V. FACTUAL ALLEGATIONS

Defendants' rate filings

22. When medical malpractice insurers change their rates in a state, they submit rate filings to the state's Department of Insurance. Those rate filings set forth the date the new rates in the rate filing are to take effect, and the type of business those rates will apply to. Rate filings also set forth either the rate the insurer will charge for ERP endorsements attaching to the policies to which the rate filing applies, or the formula the company will use to calculate such a rate.

23. On July 25, 2002, defendant ProNational submitted a rate filing to the New Jersey Department of Banking and Insurance. A memorandum accompanying the filing stated that the rates contained therein applied to new business incepting and existing business renewing on or after September 1, 2002. It also set forth the factors ProNational would apply to the rates for policies incepting or renewing on or after September 1, 2002 to produce the rate for an ERP endorsement attaching to such policies. The rate filing did not apply to ERP endorsements to policies incepting or renewing before September 1, 2002.

24. On November 6, 2003, ProNational submitted a rate filing to the New Jersey Department with an effective date of January 1, 2004 for new and renewal business. According to the filing, the rates for business incepting or renewing on or after January 1, 2004 were 52.6% higher than the rates for business that incepted or renewed before January 1, 2004. The January 1, 2004 rate filing also included tables which set forth the rates applying to doctors in each medical specialty for coverage beginning on or after January 1, 2004, and also the rates ProNational would charge those doctors for an ERP

12

endorsement at the end of a policy year that began on or after January 1, 2004. The rates in that table did not apply to ERP endorsements to policies incepting or renewing before January 1, 2004.

25  In late 2004 ProNational submitted a rate filing to the New Jersey Department effective for business incepting or renewing on or after January 1, 2005. Like its January 1, 2004 rate filing, that filing contained tables setting forth the rates applying to doctors in each medical specialty for coverage beginning on or after the effective date of the rate filing, and also the rates ProNational would charge those doctors for an ERP endorsement at the end of a policy year that began on or after the effective date of the rate filing. Those rates were substantially higher than the rates set forth in the January 1, 2004 rate filing, and did not apply to ERP endorsements to policies incepting or renewing before January 1, 2005.

Plaintiff Mercer-Bucks Orthopedics, PC

26.  On or about December 31, 2000, Plaintiff MBO purchased from defendant ProAssurance Casualty, an operating company of ProAssurance, a claims-made policy for the period December 31, 2000 through December 31, 2001.

27.  Plaintiff MBO renewed this policy for the period December 31, 2001 through December 31, 2002, and the period December 31, 2002 through December 31, 2003.

28.  In a letter dated October 30, 2003, defendant ProAssurance Casualty notified Plaintiff MBO that it was non-renewing its policy effective December 31, 2003, and that MBO had the right to purchase an ERP endorsement providing coverage for claims arising before that date but reported after that date.

29. On or about January 23, 2004, David S. Eingorn, President of MBO, sent ProAssurance Casualty a check from the MBO account at Yardville National Bank in the amount of $599,147 for an ERP endorsement which provided coverage for claims arising before December 31, 2003 but reported after that date.

30. In letters also dated October 30, 2003, defendant ProAssurance Casualty notified each MBO doctor that his policy was being cancelled and that he could purchase an Extended Reporting Endorsement to his policy which would provide coverage for claims arising between the policy's retroactive date and its cancellation date that were reported after the cancellation date. In these letters ProAssurance Casualty notified the doctors of the premium for their ERP endorsement. The doctors receiving such letters, and their ERP premiums, included the following: David S. Eingorn, $78,502; Edward J. Ford, $78,502; Michael R. Duch, $74,577; Thomas K. Bills, $78,502; Daren J. Aita, $66,726; Eric C. Gokcen, $66,726; John P. Nolan, Jr., $66,726; and Ching-Jen Wang, $19,189. In addition, Constantine A. Solomos, the CEO of MBO, who is not a doctor, also received such a letter. The ERP premium for Mr. Solomos was $63,534. Each doctor and Mr. Solomos indicated that they wished to purchase the endorsement, and countersigned their letters on December 30, 2003.

31. If plaintiff MBO had not purchased an ERP endorsement from defendants, each of these doctors and paramedical employees would have had no coverage for claims arising between January 1, 1999 and December 31, 2003 that were reported after December 31, 2003.

32. Plaintiff MBO's policy provided that the premium for MBO's ERP endorsement covering incidents arising prior to MBO's termination date shall be

computed "in accordance with ProNational's rules in effect on the termination date." The termination date of MBO's policy was December 31, 2003. Defendant ProNational's rate filing effective January 1, 2004 sets forth new business rates, renewal business rates, and ERP endorsement rates. The ERP rate in that filing is not the rate for an ERP endorsement covering claims arising through the policy period of MBO's terminating policy, but rather is the rate for an ERP endorsement covering claims arising under a policy incepting or renewing on or after January 1, 2004. Nevertheless, although the rates set forth in this rate filing applied only to ERP endorsements to policies incepting or renewing on or after January 1, 2004, defendants wrongfully charged plaintiff those higher rates for the ERP endorsement.

33. Defendants overcharged plaintiff MBO for its ERP endorsement. The correct rate that should have been charged to MBO for its ERP endorsement was $430,290. Plaintiff MBO was therefore overcharged by the $168,857 difference between the $599,147 defendants charged plaintiff MBO for its ERP endorsement and the $430,290 defendants were legally required to charge plaintiff MBO for its ERP endorsement.


Plaintiff Pascack Emergency Services, PA

34. In June 2000 Plaintiff PES purchased from defendant ProAssurance Casualty, an operating company of ProAssurance, a claims-made policy for the period June 30, 2000 through June 30, 2001.

35. Plaintiff PES renewed this policy for the period June 30, 2001 through June 30, 2002; the period June 30, 2002 through June 30, 2003; and the period June 30, 2003 through June 30, 2004.

36. In a letter dated April 29, 2004, defendant ProAssurance Casualty notified Plaintiff PES that it was non-renewing its policy effective June 30, 2004.

37. Defendant ProAssurance Casualty also notified plaintiff PES that for $283,084 it could purchase an ERP endorsement to its policy which would provide coverage for claims arising between the policy's retroactive date and its termination date that were reported after the termination date.

38. By check dated July 29, 2004, PES paid defendant ProAssurance Casualty for ERP endorsements covering the following doctors: Hilal Abboushi; Michelle Antonowicz; Walter Bakur; Joan Barrett; Glenn Berger; Kenneth Cartaxo; Louise Donikyan; Mardik Donikyan; Ahdi Elias; Robert Fogliani; Joseph Hyon; Eric Jacobs; Seyed Javadpoor; Phillip Lastella; Albert Levy; Scott Lippe; Michael Macri; Rafael Olivares; Restituto Ruiz; Steven Schreiber; Melvin Schrebnick; Steven Silodor; Hasmik Simonian; Rakesh Singh; Anthony Varriano; Leora Wartofsky.

39 If plaintiff PES had not purchased this ERP endorsement, PES and each of these doctors would have had no coverage for claims arising on or before June 30, 2004, that were reported after June 30, 2004.

40. Plaintiff PES's policy provides that the premium for PES's ERP endorsement covering incidents arising prior to the termination date shall "be computed in accordance with our rules, rates, rating plan and premiums applicable on the effective date of the endorsement." The termination date of PES's policy and the effective date of the ERP endorsement was June 30, 2004. Defendant ProNational's rate filing effective January 1, 2004 sets forth rates for new business incepting on or after January 1, 2004; for renewal business renewing on or after January 1, 2004; and for ERP endorsements to policies

incepting or renewing on or after January 1, 2004. Nevertheless, although the rates set forth in that rate filing applied only to ERP endorsements to policies incepting or renewing on or after January 1, 2004, defendants wrongfully charged plaintiff PES those higher rates for the ERP endorsement.

41. Defendants overcharged plaintiff PES for its ERP endorsement. The correct rate that should have been charged to PES for its ERP endorsement was $143,287. Plaintiff PES was therefore overcharged by the $139,797 difference between the $283,084 defendants charged plaintiff for its ERP endorsement and the $143,287 defendants were legally required to charge plaintiff for its ERP endorsement.

Plaintiff Emergency Physicians of Saint Clare's

42. On or about May 1, 2002, plaintiff EPSC purchased from defendant ProAssurance Casualty, an operating company of ProAssurance, a claims-made policy for the period May 1, 2002 through May 1, 2003.

43. Plaintiff EPSC renewed this policy for the period May 1, 2003 through May 1, 2004, and the period May 1, 2004 through May 1, 2005.

44. On or about January 24, 2005, defendant ProAssurance Casualty sent plaintiff EPSC a letter confirming receipt of a notice of the cancellation of its policy. The letter also informed EPSC that for $846,000 it could purchase an ERP endorsement to its policy which would provide coverage for claims arising between the policy's retroactive date and its cancellation date that were reported after the cancellation date, which was December 31, 2004.

45.  On or about February 21, 2005, Rohan Somar, President and CEO of EPSC, agreed to purchase for $846,000 an ERP endorsement from ProAssurance Casualty covering EPSC and all of its doctors and paramedical employees for claims arising on or before December 31, 2004 that were reported after that date.  The doctors covered by that endorsement included: A. Abreu; D. Berman; V. Diamantopoulos; R. Greaves; A. Marrocco; R. Melwani; R. Morato; S. Ortega; A. Retirado; J. Rosica; D. Salandy; R. Somar; R. Varma; C. Milosis; G. Noris; K. Owusu-Dapaah; A. Verceles; S. Amaefima; N. Lopez; T. Mastrovitch; K. Yalamanchi; E. Losee; J. Gonzalez.  If plaintiff EPSC had not purchased this ERP endorsement, EPSC and each of these doctors and paramedical employees would have had no coverage for claims arising on or before December 31, 2004 that were reported after December 31, 2004.

46.  Plaintiff EPSC's policy provided that the premium for EPSC's ERP endorsement covering incidents arising prior to EPSC's termination date shall "be computed in accordance with our rules, rates, rating plan and premiums applicable on the effective date of the endorsement."  The termination date of EPSC's policy -- and the effective date of EPSC's endorsement-- was December 31, 2004.  Defendant ProNational's rate filing effective January 1, 2005 sets forth rates effective for claims-made coverage incepting or renewing on or after January 1, 2005, and also for "Reporting Endorsement at End of Year" for claims-made policies incepting or renewing on or after January 1, 2005.  Notwithstanding the fact that the ERP endorsement rates contained in this filing  applied only to ERP endorsements to policies incepting or renewing on or after January 1, 2005, defendants wrongfully charged plaintiff EPSC those higher rates for its ERP endorsement.

18

47  Defendants overcharged plaintiff EPSC for its ERP endorsement. The correct rate that should have been charged to EPSC for its ERP endorsement was substantially less than the $846,000 EPSC was billed and paid.

## COUNT ONE --Violation of the New Jersey Consumer Fraud Act (As to Class I Only)

48.  Section 2 of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-2, prohibits the use of any unconscionable commercial practice, deception, fraud, false pretense, false promise, or misrepresentation.  By charging plaintiffs the higher rates for ERP endorsements which provide coverage for incidents arising after plaintiffs' policies had terminated, defendants engaged in an unconscionable commercial practice which included deception, fraud, false pretense, false promise, and misrepresentation.

49.  Section 2 of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-2, also prohibits the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission.  Defendants knowingly concealed and suppressed and omitted to state that they were charging plaintiffs for more costly ERP endorsements which were based on the filed rates for providing coverage for incidents arising after plaintiffs' policies had terminated, rather than the proper premium relating to plaintiffs' policies.

50.  Plaintiffs had no practical alternative but to purchase an ERP endorsement from defendants because by definition, an ERP endorsement can be purchased only from the company providing the underlying coverage.

51.  As a result of the wrongful conduct set forth herein, defendants violated the New Jersey Consumer Fraud Act, N.J.S.A. 56:8.1 et seq.

Wherefore, plaintiffs demand judgment against defendants for compensatory damages, treble damages, punitive damages, attorney's fees, interest, costs of suit and such further relief as the Court may deem appropriate.

### COUNT TWO--Breach of contract (As to Class I and Class II)

52. Plaintiffs incorporate the prior factual allegations as if fully set forth herein.

53. At all relevant times plaintiffs had in effect with defendants policies of insurance.

54. By the terms of plaintiffs' policies, defendants were required to determine the premium for plaintiffs' ERP endorsements in accordance with defendants' rates and rules in effect on the effective date of the endorsement, or in accordance with defendants' rules in effect on the termination date. Defendants' rates and rules in effect on those dates required defendants to charge plaintiffs the rates defendants had filed for ERP endorsements attaching to policies incepting or renewing on the date plaintiffs' policies incepted or renewed.

55. In fact, however, defendants overcharged plaintiffs by wrongfully charging them the higher rate defendants had filed for ERP endorsements attaching to policies incepting or renewing after plaintiffs' policies incepted or renewed, which, unlike plaintiffs' endorsements, covered claims arising after plaintiffs' coverage terminated.

56. Defendants breached their contracts with plaintiffs, and the duty of good faith and fair dealing which is implied in every contract, by failing to perform in accordance with the terms of the contract.

57. Plaintiffs had no practical alternative but to purchase an ERP endorsement from defendants because by definition, an ERP endorsement can be purchased only from the company providing the underlying coverage.

58. Plaintiffs at all relevant times complied with all applicable terms of their contracts.

59. Plaintiffs have suffered significant economic losses as a direct and proximate result of defendants' breach of contract and breach of the implied duty of good faith and fair dealing implied therein, and are entitled to all legally cognizable damages caused thereby.

Wherefore, plaintiffs demand judgment against defendants for compensatory damages, attorneys' fees, interest, costs of suit and such further relief as the Court may deem appropriate.

### COUNT THREE--Accounting (As to Class I and Class II)

60. Plaintiffs incorporate the prior factual allegations as if fully set forth herein.

61. Defendants have been unjustly enriched by their wrongful conduct, acts and omissions in connection with having charged plaintiffs an unlawful price for ERP endorsements to their policies.

62. The price charged by defendants for those endorsements was in excess of any amounts plaintiffs reasonably would have expected to pay for such endorsements and was significantly in excess of any amounts defendants should have or rightfully could have charged for such endorsements.

63. Plaintiffs had no practical alternative but to purchase an ERP endorsement from defendants because by definition, an ERP endorsement can only be purchased from the company providing the underlying coverage.

64. Retention of the benefit conferred upon defendants by plaintiffs would be unjust.

65. Plaintiffs have suffered damages due to the wrongful conduct, acts and omissions of defendants as alleged herein. Plaintiffs paid premiums for the ERP endorsements to their policies far in excess of the amount set forth in the contract and the appropriate filed rates, and beyond any reasonable expectations of plaintiffs.

66. Wherefore, plaintiffs demand an order or judgment requiring defendants to disgorge all overcharges to the named plaintiffs and the class, and to provide an accounting of all payments charged and received by defendants for ERP endorsements pertaining to policies issued in 2003, 2004 and 2005, plus attorneys fees, interest, costs of suit and such further relief as the Court may deem appropriate.

## V. JURY DEMAND

Please take notice that plaintiffs hereby demand a trial by jury for all issues so triable.

22

## VI. CERTIFICATION PURSUANT TO LOCAL RULE 11.2

Pursuant to L.Civ.R. 11.2, the undersigned certifies that the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

Dated: December 9, 2009                 By: _____

Eric S. Poe, Esq.
214 Carnegie Center Blvd., Suite 301
Princeton, NJ 08540
Telephone: (609) 520-0800 ext. 7610
Fax: (866) 298-6341
Email: eric.poe@attorney-cpa.com

*Attorney for Plaintiffs*

Of Counsel:

Mehri & Skalet, PLLC
Steven A. Skalet, Esq.
Jay Angoff, Esq.
1250 Connecticut Avenue, NW, Ste. 300
Washington, DC 20036
Telephone: (202) 822-5100
Fax: (202) 822-4997
Email: sskalet@findjustice.com
       jangoff@findjustice.com

Gary D. McCallister & Associates, LLC
Gary D. McCallister, Esq.
Jamie Goldstein, Esq.
120 North LaSalle Street
Chicago, IL 60602
Telephone: (312) 345-0611
Fax: (312) 345-0612
Email: gdm@gdmlawfirm.com
       jgoldstein@gdmlawfirm.com