## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

EMERGENCY PHYSICIANS OF ST.
CLARE'S, LLC, MERCER BUCKS
ORTHOPEDICS, PC, and PASCACK
EMERGENCY SERVICES,

On behalf of themselves and all others
similarly situated,

Plaintiffs,

     v.

PROASSURANCE CORPORATION,
PROASSURANCE CASUALTY
COMPANY, and PROASSURANCE
INDEMNITY COMPANY, INC.,

Defendants.

Civil Action No.
09-cv-6244-WJM-MF

**Motion Day: April 5, 2010**

**[Filed Electronically]**

<u>**HEARING REQUESTED**</u>

## PLAINTIFFS' AMENDED BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION OR, IN THE ALTERNATIVE DISMISS THE COMPLAINT

Eric Poe, Esq.
214 Carnegie Center Blvd.
Suite 301
Princeton, NJ 08540
Telephone: (609) 520-3067
Fax: (866) 298-6341
Email: epoe@epoelaw.com

Of Counsel:

**Mehri & Skalet, PLLC**
Steven A. Skalet, Esq. (*pro hac vice*)
1250 Connecticut Avenue, NW
Suite 300
Washington, DC 20036
Telephone: (202) 822-5100
Fax: (202) 822-4997
Email: sskalet@findjustice.com

**Gary D. McCallister & Associates, LLC**
Gary D. McCallister, Esq. (*pro hac vice*)
Jamie Goldstein, Esq. (*pro hac vice*)
120 North LaSalle Street
Chicago, IL 60602
Telephone: (312) 345-0611
Fax: (312) 345-0612
Email: gdm@gdmlawfirm.com
       jgoldstein@gdmlawfirm.com

*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

I.   FACTUAL BACKGROUND ........................................................ 1

II.  ARGUMENT ........................................................................ 3

  A.  The Arbitration Agreement is Not Enforceable ..................... 3

    1.  The Arbitration Agreement is an Unconscionable
        Contract of Adhesion .............................................. 3

        a.  Important Public Interests are Implicated in Medical
            Malpractice Insurance Agreements …..……………….....5

        b.  The Parties had Unequal Bargaining Power ........................ 6

        c.  There was a Significant Degree of Economic Compulsion
            Motivating Plaintiffs .................................................. 7

    2.  The Arbitration Agreement is Not Enforceable Because
        Plaintiffs Did Not Waive their Rights to Pursue Statutory Rights
        in Court Before a Jury ............................................... 8

        a.  Given the Important Public Policy Considerations Involved
            in Cases Alleging a Violation of the Consumer Fraud Act,
            Courts Must Examine Arbitration Agreements on a
            Case-by-Case Basis ................................................... 8

        b.  A Waiver of the Right to Pursue Statutory Rights in Court
            Must be Clear and Unambiguous ................................. 9

        c.  Defendants' Arbitration Agreement Significantly Skews the
            Balance Between the Public Policies ......................... 13

    3.  The Cost Provisions of the Arbitration Agreement are
        Unconscionable………….……………………………………14

    4.  The Federal Arbitration Act Requires that Cases be Stayed
        Pending Arbitration ................................................. 17

B.  Plaintiffs' Claims Should Not Be Dismissed ...................................... 17

   1.  Legal Standard ...................................................................... 17

   2.  Named Plaintiffs Have Standing To Bring These Class Action
       Claims Against All Defendants Under the Concerted Action
       and Juridical Link Doctrines ............................................... 18

       a.  Defendants Engaged in a Concerted Scheme to Wrongfully
           Overcharge Former Policyholders for ERPs ........................... 23

       b.  Defendants Are Juridically Linked in a Manner That
           Suggests a Single Resolution of the Dispute Would Be
           Expeditious .................................................................. 24

   3.  Defendants' Specific Requests for Dismissal of the Claims of
       Each of the Named Plaintiffs Based on Factual Assertions Are
       Inappropriate for Resolution on a Motion to Dismiss Prior to
       Discovery ........................................................................... 26

       a.  Plaintiff Emergency Physicians of St. Clare's Has Stated a
           Viable Claim ................................................................. 26

       b.  Plaintiff Pascack Has Stated a Viable Claim ......................... 28

       c.  Plaintiff Mercer Bucks Orthopedics' Claims are Timely .... 29

           i.   The Statute of Limitations Did Not Begin to Run on
                October 30, 2003 ..................................................... 29

           ii.  The Statute of Limitations Does Not Begin to Run
                Until a Plaintiff Knew or Should Have Known of the
                Injury .................................................................... 30

           iii. Plaintiff Mercer Bucks Did Not Know or Have Reason
                To Know of the Wrongdoing in 2003 .............................. 32

IIII.  CONCLUSION ......................................................................... 35

# <u>TABLE OF AUTHORITIES</u>

## *Cases*

*Adamson v. Foulke Mgm't Corp.*
  No. 08-4819, 2009 U.S. Dist. LEXIS 118061
  (D.N.J. Dec. 18, 2009) ................................................................................ 16

*Allen v. Metropolitan Life Ins. Co.*
  208 A.2d 638 (N.J. 1965) ............................................................................ 4

*American Pipe & Constr. Co. v. Utah*
  414 U.S. 538 (1974) ................................................................................... 17

*Apgar v. Lederle Laboratories*
  588 A.2d 380 (N.J. 1991) .......................................................................... 32

*Ashcroft v. Iqbal*
  129 S. Ct. 1937 (2009) ............................................................................... 18

*Barry v. Arrow Pontiac, Inc.*
  494 A.2d 804 (N.J. 1985) ............................................................................ 6

*Bell Atlantic Corp. v. Twombly*
  550 U.S. 544 (2007) ............................................................................. 17, 18

*Bueff Enterprises Florida, Inc. v. Villa Pizza, LLC*
  No. 07-1259, 2008 U.S. Dist. LEXIS 23957 (D.N.J. March 24, 2008) ...... 7

*Clark v. McDonald's Corp.*
  213 F.R.D. 198 (D.N.J. 2003) .................................................................... 18

*Conley v. Gibson*
  355 U.S. 41 (1957) ..................................................................................... 17

*County of Morris v. Fauver*
  707 A.2d 958 (N.J. 1998) ........................................................................... 31

*Doto v. Russo*
  659 A.2d 1371 (N.J. 1995) ..................................................................... 3, 4

*Fallick v. Nationwide Mutual Ins. Co.*
   162 F.3d 410 (6th Cir. 1998) ............................................................. 18, 19

*Fernandi v. Strully*
   173 A.2d 277 (N.J. 1961) ........................................................... 31

*Finestein v. BDS Remodeling Services, LLC*
   No. A.-2555-03T1, 2005 WL 704290 Unpub. (N.J. Super. App. Div.
   March 21, 2005) ...................................................................... 9

*Follette v. Vitanza*
   658 F. Supp. 492 (N.D.N.Y. 1987) ............................................. 22

*Garfinkel v. Morristown Obstetrics and Gynecology Assoc., P.A.*
   773 A.2d 665 (N.J. 2001) .............................................. 9, 10, 12

*Gillespie v. Janey*
   No. 2:09-cv-00885, 2010 U.S. Dist. LEXIS 20041
   (D.N.J. Mar. 5, 2010).......................................................... 31

*Gras v. Associates FirstCapital Corp.*
   786 A.2d 886 (N.J. 2001) .......................................................... 9

*Green Fin. Corp. v. Randolph*
   531 U.S. 79 (2000) .................................................................. 14

*Haas v. Pittsburgh Nat'l Bank*
   381 F. Supp. 801 (W.D. Pa. 1974) ............................................ 21

*Haas v. Pittsburgh Nat'l Bank*
   526 F.2d 1083 (3d Cir. 1975) .............................................. 20, 21

*Haas v. Pittsburgh Nat'l Bank*
   60 F.R.D. 604 (W.D. Pa. 1973) ............................................... 21

*Hosp. Council of W. Pa. v. City of Pittsburgh*
   949 F.2d 83 (3d Cir. 1991) ....................................................... 18

*Johnson  v. Geico*
   516 F. Supp 2d 351 (D. Del. 2007) ........................................... 23

*Kamaratos v. North East General Contractors*
   812 A.2d 531 (N.J. Super. Ct. App. Div. 2003)......................... 14

*Kemp Indus. v. Saftey Light Corp.*
No. 92-95, 1994 U.S. Dist. LEXIS 21466 (D.N.J. 1994).................... 31, 32

*Kuhn v. Terminex International*
No. A-1518-07T3, 2008 N.J. Super. Unpub. LEXIS 2005
(N.J. Super. Ct. App. Div. May 9, 2008)............................................ 11, 12

*La Mar v. H & B Novelty & Loan Co.*
489 F.2d 461 (9th Cir. 1973) ....................................................... 20, 22

*Lloyd v. Hovensa, LLC*
369 F.3d 263 (3d Cir. 2004) ............................................................... 17

*Lopez v. Sawyer*
300 A.2d 563 (1973).......................................................................... 31

*Marchak v. Claridge Collins, Inc.*
663 A.2d 531 (N.J. 1993) .................................................................. 10

*Marchwinski v. Oliver Tyrone Corp.*
81 F.R.D. 487 (W.D. Pa. 1979) ........................................................ 25

*Martindale v. Sandvik*
800 A.2d 872 (N.J. 2002) .................................................................. 13

*Meier v. New Jersey Life Ins. Co.*
503 A.2d 406 (N.J. 1985) .................................................................... 3

*Muhammad v. County Bank of Rehoboth Beach*
912 A.2d 88 (N.J. 2006) .................................................................... 16

*Mullin v. Automobile Protection Corp.*
No. 07-3327, 2008 U.S. Dist. LEXIS 87577 (D.N.J. Sept. 29, 2008) ...... 12

*O'Shea v. Littleton*
414 U.S. 488 (1974) .......................................................................... 18

*Osgood v. Harrah's Entm't, Inc.*
202 F.R.D. 115 (D.N.J. 2001) ....................................................... 18, 19

*Parilla v. IAP Worldwide Servs.*
368 F.3d 269 (3d Cir. 2004) .............................................................. 15

*Pennell v. City of San Jose*
   485 U.S. 1 (1988) ..................................................................................... 18

*President v. Jenkins*
   853 A.2d 247 (N.J. 2004) ....................................................................... 3, 4

*Rockel v. Cherry Hill Dodge*
   847 A.2d 621 (N.J. 2004) ........................................................... 6, 8, 13, 14

*Rudbart v. New Jersey Dist. Water Supply Comm.*
   605 A.2d 681 (N.J. 1992) ............................................................................ 5

*S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group, Ltd.*
   181 F.3d 410 (3d Cir. 1999) ................................................................ 31, 32

*Salvadori v. Option One Mortgage Corp.*
   420 F. Supp. 2d 349 (D.N.J. 2006)............................................................ 13

*Sparks v. St. Paul. Ins. Co.*
   495 A.2d 406 (N.J. 1985) ............................................................................ 4

*Steel Co. v. Citizens for Better Env't*
   523 U.S. 83 (1998) ..................................................................................... 18

*Van Bursirk v. Carey Canadian Mines, Ltd.*
   760 F.2d 481 (3d Cir. 1985) ....................................................................... 32

*Vispisiano v. Ashland Chemical Co.*
   527 A.2d 66 (N.J. 1987) ...................................................................... 31, 32

*Voorhees v. Preferred Mut. Ins., Co.*
   607 A.2d 1255 (N.J. 1972) .......................................................................... 4

*Wu v. MAMSI Life & Insur. Co.*
   256 F.R.D. 158 (D. Md. 2008) ................................................................... 24

*Zacarias, v. Allstate*
   775 A. 2d 1262 (N.J. 2001) ........................................................................ 4

*Statutes*

N.J. Stat. Ann. § 2A:14-1 (2010) ............................................................ 30, 31

N.J. Stat. Ann. § 59:13-1 (2010) ................................................................. .31

*Rules*

Fed. Civ. P. 12(d) ..................................................................................... 27

Fed. R. Civ. P. 12(b)(6)............................................................................. 17

Fed. R. Civ. P. 23(a).................................................................................. 21

# I.    FACTUAL BACKGROUND

This is a class action filed by three medical groups, on behalf of themselves and others similarly situated, against medical malpractice insurers for overcharging insured entities that purchased Extended Reporting Period Endorsements ("ERPs") to insurance policies, also known as "tail coverage."   Essentially, the ERP is an endorsement that attaches to the policy and extends the reporting time period for coverage of claims of alleged medical negligence that occurred during the policy coverage period.

The named Plaintiffs, Emergency Physicians of St. Clare's LLC, ("St. Clare's"), Mercer Bucks Orthopedics, PC, ("Mercer Bucks"), and Pascack Emergency Services, ("Pascack"), are New Jersey medical practice groups that purchased "claims-made" medical malpractice insurance policies.[1] Complaint ¶¶ 12-14.  Defendant ProAssurance Corporation ("ProAssurance Corporation"), is an insurance holding company that operates through six consolidated subsidiaries/operating companies, including Defendant ProAssurance Casualty Company, ("ProAssurance Casualty"), a subsidiary of ProAssurance Corporation, which in 2008 accounted for 28% of ProAssurance's gross written premium, Complaint ¶¶ 15, 17, and Defendant ProAssurance Indemnity Company, ("ProAssurance Indemnity"), a

---

[1] A "claims-made" insurance policy is one that pays claims presented to the insurer during the term of the policy.

subsidiary of ProAssurance Corporation, which in 2008 accounted for 55% of ProAssurance's written premium.  Plaintiffs purchased their medical malpractice insurance and ERPs directly from ProAssurance Casualty. Complaint ¶¶ 26, 34, 42.

Plaintiffs allege that Defendant ProAssurance Corporation "uniformly directs ProAssurance Casualty and ProAssurance Indemnity, and uniformly applies the same polices with respect to ProAssurance Casualty and ProAssurance Indemnity."  Complaint ¶ 18.  Plaintiffs further allege that all of the Defendants have the same chairman, W. Stencil Starnes, and that the officers and directors or trustees of ProAssurance Casualty and ProAssurance Indemnity are substantially identical.  Id.

The core complaint is that Plaintiffs' policies included language (various) providing that they had a right to purchase an ERP at rates in effect on the date of termination of their policies or rates in effect for the year in which they purchased their policies, but that instead of charging those rates, "for policies terminating in 2003, 2004, and 2005, defendants charged plaintiffs the rate applying to ERP endorsements attaching to policies written after plaintiffs' policies terminated.  That rate was substantially higher than the rate defendants had filed [with the State] that applied to plaintiffs' ERP endorsements."  Complaint ¶¶ 4, 5 (emphasis added).

The two classes of persons Plaintiffs seek to represent are similarly situated former New Jersey policyholders of Defendants whose policies terminated during 2003, 2004, and 2005, and all former policyholders of Defendants whose policies terminated during 2003, 2004, and 2005. Complaint ¶¶ 7, 20.

Plaintiffs bring their claims under the New Jersey Consumer Fraud Act ("CFA") (Count I), under common law for breach of contract (Count II), and for unjust enrichment (Count III). Plaintiffs seek judgment on their own behalf and on behalf of the two classes of similarly situated persons and request compensatory, punitive and/or treble damages, an accounting, costs and fees and other relief as deemed appropriate by this Court.

## II.    ARGUMENT

### A.    The Arbitration Agreement is Not Enforceable

#### 1.    The Arbitration Agreement is an Unconscionable Contract of Adhesion

In New Jersey an insurance policy is considered a "contract of adhesion between parties who are not equally situated." *President v. Jenkins*, 853 A.2d 247, 254 (N.J. 2004) (quoting *Doto v. Russo*, 659 A.2d 1371, 1376 (N.J. 1995) (quoting *Meier v. New Jersey Life Ins. Co.,* 503 A.2d 406 (N.J. 1985)). Such policies are often "prepared unilaterally by the insurer, and have always been subjected to careful judicial scrutiny to avoid

3

injury to the public." *Sparks v. St. Paul. Ins. Co.,* 495 A.2d 406, 412 (N.J. 1985).

The New Jersey Supreme Court has explained that an insurance company is an "expert in its field and its varied and complex instruments are prepared by it unilaterally whereas the insured or prospective insured is a layman unversed in insurance provisions and practices." *Allen v. Metropolitan Life Ins. Co.*, 208 A.2d 638, 644 (N.J. 1965). "Moreover, policies are frequently not read by the insured, 'whose understanding is often impeded by the complex terminology used in the standardized forms.'" *President,* 853 A.2d at 254 (citing *Doto,* 659 A.2d at 1376). Thus, when called on to interpret ambiguous insurance policies, courts "assume a particularly vigilant role in ensuring their conformity to public policy and principles of fairness." *Voorhees v. Preferred Mut. Ins., Co.,* 607 A.2d 1255, 1260 (N.J. 1972). *See President,* 853 A.2d 247 at 563 (explaining that courts should "interpret the contract to comport with the reasonable expectations of the insured") (quoting *Zacarias, v. Allstate,* 775 A. 2d 1262, 1264 (N.J. 2001)).

New Jersey employs a four part analysis to determine whether contracts of adhesion are unconscionable. *Rudbart v. New Jersey Dist.*

4

*Water Supply Comm.*, 605 A.2d 681, 687 (N.J. 1992).[2]  Not only should the take-it-or-leave-it nature of the contract be examined, but the Court should also consider (1) the subject matter of the contract, (2) the parties' relative bargaining positions, (3) the degree of economic compulsion motivating the "adhering" party, and (4) the public interests affected by the contract.  *Id*. An analysis of the *Rudbart* factors warrants the determination that the arbitration provision is unconscionable and therefore unenforceable.

### a. Important Public Interests are Implicated in Medical Malpractice Insurance Agreements

As a contract for medical malpractice insurance, the subject matter of the contract supports a determination that the arbitration agreement is unenforceable.  Medical professionals face the risk of incurring large and potentially ruinous damage awards in malpractice actions in the absence of insurance.  The ability to purchase such coverage at terms that fairly protect the legal rights of physicians and other medical professionals is important to ensuring the availability of quality medical services in the state.  In addition,

---

[2] The court in *Rudbart* determined that a contract to purchase a "project note" of a public corporation was enforceable because the notes were available on an open market, no investor was under economic pressure to buy a note in the subject project, and the notes were not consumer necessities because prospective investors could choose from a vast selection of alternative investments. 605 A.2d at 687.  Consequently, the purchasers were not driven to make the purchase by a monopolistic market or any other economic constraints.  *Id*.  Accordingly, due to the lack of disparity in bargaining positions, even though the contract was considered to be one of adhesion, the principal justification for invalidating the terms of the contract were not present.  *Id*.

New Jersey courts have explained that the important public policy behind the CFA, of which Plaintiffs allege a violation, is to "root out consumer fraud." *Rockel v. Cherry Hill Dodge*, 847 A.2d 621, 623 (N.J. 2004). *See also Barry v. Arrow Pontiac, Inc.*, 494 A.2d 804, 811 (N.J. 1985) ("The Act was passed in response to widespread complaints about selling practices that victimized consumers, and thus was designed to prevent deception, fraud, or falsity, whether by acts of commission or omission, in connection with the sale and advertisement of merchandise and real estate. The Act is remedial and has been liberally construed in favor of protecting consumers."). There are important public policy interests involved in remedying violations of the CFA, as well as the significant public interest in protecting and retaining physicians within New Jersey to serve the public. These interests weigh in favor of a determination that the mandatory arbitration clause of this contract of adhesion is unconscionable and unenforceable.

### b.    The Parties had Unequal Bargaining Power

Defendants are large, well-funded, multi-billion dollar asset based powerful insurance companies who presumably utilized knowledgeable and experienced attorneys that specialize in the field of insurance in drafting their contracts. Although Plaintiffs are physicians, they are not sophisticated regarding complicated insurance policy language, policy-types, improper

pricing policies, the CFA, or the legal rights Defendants hoped they would waive by signing the contract of adhesion currently at issue.    Rather, Plaintiffs were confronted with a termination of their malpractice coverage and had few alternatives other than to purchase tail coverage at the prices charged by Defendants.

### c.    There was a Significant Degree of Economic Compulsion Motivating Plaintiffs

The Plaintiffs are medical practice groups and were under extreme pressure to obtain insurance to avoid a gap in coverage.  ProAssurance had a monopoly in selling tail coverage for its policies and the consequence of the policies being terminated or non-renewed was that these groups and physicians were faced with an imminent lapse in coverage and exposure to potentially ruinous malpractice suits and judgments.    This court has recognized the compulsion inherent in insurance agreements.  *See, e.g., Bueff Enterprises Florida, Inc. v. Villa Pizza, LLC*, No. 07-1259, 2008 U.S. Dist. LEXIS 23957, *7-8 (D.N.J. March 24, 2008) (determining that plaintiffs did not waive their right to a jury trial even where they could have attempted to negotiate their franchise agreement because unlike insurance agreements, franchise agreements are not contracts of adhesion and plaintiffs were under no particular pressure to purchase the franchise at issue).

**2.    The Arbitration Agreement is Not Enforceable Because Plaintiffs Did Not Waive their Rights to Pursue Statutory Rights in Court Before a Jury**

The arbitration clause is not enforceable because it does not contain a clear and unmistakable waiver of Plaintiffs' rights to pursue their statutory claims in court, nor a waiver of their rights to a jury trial.  When viewed in the context of a contract of adhesion, the balance of interests plainly falls in favor of the Plaintiffs and the arbitration clause should be found to be unenforceable.

**a.    Given the Important Public Policy Considerations Involved in Cases Alleging a Violation of the Consumer Fraud Act, Courts Must Examine Arbitration Agreements on a Case-by-Case Basis**

When considering the enforceability of arbitration agreements in a case alleging a violation of the CFA, it is necessary to balance the important public policy behind the CFA to "root out consumer fraud" and the competing public policy favoring arbitration.  *Rockel v. Cherry Hill Dodge*, 847 A.2d 621, 623 (N.J. 2004) ("Such provisions may be enforced if they contain the appropriate attributes or disregarded if they do not.") (quoting *Gras v. Associates FirstCapital Corp.*, 786 A.2d 886, 892 (N.J. 2001)).  Because the public interests underlying these policies are "in or near

8

equipoise," New Jersey courts have determined that rather than applying a bright-line rule, courts must consider the enforceability of arbitration agreements on a case-by-case basis. *Id.* "The delicate balance between the policies of the CFA and the policy in favor of arbitration requires that the consumer be given reasonable notice of such provisions, that the provisions contain a clear waiver of statutory rights, and that the arbitration agreement be phrased in unambiguous terms." *Id.* at 627.

> **b.    A Waiver of the Right to Pursue Statutory Rights in Court Must be Clear and Unambiguous**

The "[w]aiver of statutory rights provisions in arbitration agreements must be clear and explicit." *Garfinkel v. Morristown Obstetrics and Gynecology Assoc., P.A.*, 773 A.2d 665, 670 (N.J. 2001) (additional citations omitted). As the Appellate Division reiterated in *Finestein v. BDS Remodeling Services, LLC¸* No. A.-2555-03T1, 2005 WL 704290 Unpub. (N.J. Super. App. Div. March 21, 2005):

> A contractual provision in which a consumer elects arbitration as the exclusive remedy, however, must also be read in light of its effect on the consumer's right to sue. A clause depriving a citizen of access to the court should clearly state its purpose. The point is to assure that the parties know that in electing arbitration as the exclusive remedy, they are waiving their time-honored right to sue.

*Id*. at *2 (quoting *Marchak v. Claridge Collins, Inc.*, 663 A.2d 531, 535 (N.J. 1993). To this end, the "waiver of statutory rights must be clearly and unmistakably established and contractual language alleged to constitute a waiver will not be read expansively." *Garfinkel*, 773 A.2d at 670. This is especially so in the context of a claim brought pursuant to the CFA given the important public policy considerations of that statute.

In *Rockel*, the court determined that an agreement to arbitrate was not enforceable despite the existence of language apprising plaintiffs that: (1) they were waiving their "right to a trial by jury or a trial in court;" (2) discovery in arbitration "is generally more limited than in a lawsuit;" and (3) "[o]ther rights that each of us would have in court may not be available in arbitration." *Id.* at 624, 626-27. The court explained that:

> In *Gras* we also emphasized that the arbitration provision expressly stated that, by signing, the consumer was agreeing to arbitrate "***any claim or dispute based on a*** federal or ***state statute***." The contract documents in question do not contain any similar language. The only statement which defendant has alluded to in attempting to meet this requirement - - the amorphous statement that "[o]ther rights that each of us would have in court may not be available in arbitration" - - falls woefully short of what *Gras* requires.

*Id.* (emphasis in original) (internal citations omitted).

In *Kuhn v. Terminex International*, No. A-1518-07T3, 2008 Unpub. LEXIS 2005, *5-6 (N.J. Super. Ct. App. Div. May 9, 2008), the court

10

concluded that the arbitration clause was unenforceable where it failed to inform plaintiffs they were waiving their right to pursue their statutory claims in court.  Specifically, the Agreement provided:

> 10.  ARBITRATION.  The Purchaser and Terminix agree that any controversy or claim between them arising out of or relating to the interpretation, performance or breach of any provision of this agreement shall be settled exclusively by arbitration.  Such arbitration shall be conducted in accordance with the Commercial Arbitration Rules then in force of the American Arbitration Association.  The arbitration award shall be final and binding on both parties.  Judgment upon such arbitration award may be entered in any court having jurisdiction.

*Id.* at 1.  The court explained that "[a]lthough the clause may be reasonably construed as effecting a waiver of trial of contractual claims, it does not contain an explicit agreement to arbitrate nor waiver of trial of statutory claims such as those asserted by plaintiffs in this litigation."  *See also, id.* at *6 (determining arbitration clause was deficient where "its content does not inform the consumers they have waived their statutory rights or their right to a jury trial).[3]  *See also Mullin v. Automobile Protection Corp.*, No. 07-3327, 2008 U.S. Dist. LEXIS 87577, *12-15 (D.N.J. Sept. 29, 2008) (determining

---

[3] The court in *Kuhn* also noted that defendant did not provide the plaintiff consumers with reasonable notice of the arbitration clause because "it is one of twelve general conditions undistinguishable from all the other boiler-plate provisions."  *Kuhn*, 2008 N.J. Super. Unpub. LEXIS 2005 at 6.  Similar to the contract at issue in *Kuhn*, the one paragraph arbitration clause in Defendants' contract is indistinguishable from the multiple pages of boilerplate provisions.

that based on the reasoning in *Kuhn*, plaintiffs did not waive their statutory rights under the CFA).

In *Garfinkel v. Morristown Obstetrics & Gynecology Assocs., P.A.*, the court held that a contractual clause stating that "'any controversy or claim' that arises from the agreement or its breach shall be settled by arbitration" did not require plaintiffs to arbitrate their claims because the clause failed to "mention, either expressly or by general reference, statutory claims redressable by [The Law Against Discrimination, N.J.S.A. 10:5-1 to -49]." 773 A.2d 665, 671 (N.J. 2001).  Specifically, the court explained:

> The Court will not assume that employees intend to waive those rights unless their agreement so provides in unambiguous terms.  That said, we do not suggest that a party need refer specifically to the [statute at issue] or list every imaginable statute by name to effectuate a knowing and voluntary waiver of rights.  To pass muster, however, a waiver-of-rights provision should ***at least provide that the employee agrees to arbitrate all statutory claims*** arising out of the employment relationship or its termination.  It should also reflect the employee's general understanding of the type of claims included in the waiver, e.g., workplace discrimination claims.

*Id.* at 672.

### c.    Defendants' Arbitration Agreement Significantly Skews the Balance Between the Public Policies

Similar to the agreements at issue in *Rockel*, *Kuhn*, and *Garfinkel*, the arbitration agreement at issue here fails to "pass muster."[4]   The agreement here states that:

> ***Any dispute, claim or controversy arising out of, relating to or in connection with this policy, its subject matter or its negotiation***, as to the existence, validity, interpretation, performance, non-performance, enforcement, operation, breach of contract, breach of warranty, continuance of termination thereof or any claim alleging fraud, deceit, or suppression of any material fact or breach of fiduciary duty shall be submitted to binding arbitration . . . .

Declaration of Michael Dinger ("Dinger Declaration"), Exs. A, B & C ¶ XIII.  *See Rockel*, 847 A.2d at 626 (discussing language stating that "'any controversy or claim arising out of or relating to this Agreement' shall be 'settled by arbitration'" and determining that "this provision represents an insufficient foundation for an order compelling arbitration.").  Although the

---

[4] The arbitration agreement in this case is factually distinguishable from the ones courts have upheld as enforceable.  For example, in *Martindale v. Sandvik,* 800 A.2d 872, 883-84 (N.J. 2002), the court determined that the language in that agreement was a clear and unambiguous waiver of plaintiff's statutory rights ***and*** that plaintiff agreed to waive her right to a jury trial.  *Id*., *see also id.* at 875 ("I agree to waive my right to a jury trial in any action or proceeding related to my employment with Sandvik.").  Similarly, in *Salvadori v. Option One Mortgage Corp.*, 420 F. Supp. 2d 349 (D.N.J. 2006), the arbitration agreement explicitly stated that "both of us are waiving our rights to have disputes resolved in court by a judge or ***jury***" and that the arbitration agreement applied to claims "includ[ing], but not limited to federal or state contract, tort, ***statutory***, regulatory common law and equitable claims."  *Id.* at 352, 355.

agreement lists the types of claims included in the waiver, it does not mention the CFA or any type of statutory rights. Dinger Declaration, Exs. A, B & C ¶ XIII. Moreover, the agreement provides no explanation, discussion, or notice regarding the consequences of agreeing to arbitrate or what rights (such as the right to jury trial) are being waived. See *Kamaratos v. North East General Contractors*, 812 A.2d 531, 538 (N.J. Super. Ct. App. Div. 2003) (reversing decision to uphold arbitration decision and noting that although the agreement referred to the arbitration statutes, "it did not clearly state the consequences of an agreement to arbitrate disputes over legal fees."). As such, "the arbitration provisions at hand significantly skew the balance between the purposes of the CFA and the policy in favor of arbitration of disputes, thus requiring a rejection of defendant's attempts to compel arbitration." *Rockel*, 847 A.2d at 623.

### 3. The Cost Provisions of the Arbitration Agreement are Unconscionable

An arbitration agreement is unconscionable where the costs are so high as to prevent a party "from effectively vindicating her federal statutory rights in the arbitral forum." *Green Fin. Corp. v. Randolph*, 531 U.S. 79, 90 (2000). To meet this burden, plaintiffs must (1) come forward with some evidence to show the projected fees that would apply, and (2) show their

inability to pay those costs. *Parilla v. IAP Worldwide Servs.*, 368 F.3d 269, 283-85 (3d Cir. 2004).

The arbitration agreement provides that arbitration will be conducted pursuant to the Commercial Arbitration Rules of the American Arbitration Association ("AAA"). Dinger Declaration, Exs. A, B & C ¶ XIII. Because Plaintiffs bring this case on behalf of similarly situated entities, AAA's Supplementary Rules for Class Arbitration will also apply to the proceeding. http://www.adr.org/sp.asp?id=21936. AAA's Supplementary Rules for Class Arbitration require the party demanding arbitration to pay a preliminary filing fee of $3,350 which covers all AAA administrative fees up through the rendering of a Clause Construction Award. *Id.* at Rule 11(a). Subsequent to the Clause Construction Award, the requesting party is then required to pay a supplemental fee based on the amount of the claim at issue in the class action pursuant to the fee schedule set forth in AAA's Commercial Arbitration Rules. *Id.* The Commercial Rules require for cases with claims between $5,000,000 and $10,000,000 an initial filing fee of $10,200 and a case service fee of $4,000.[5] Additionally, unlike a court proceeding, the parties are required to compensate the arbitrator at his or her professional rate and pay other costs such as travel, arbitrator expenses, and

---

[5] A claimant is required to pay a filing fee of $10,000 in cases for an unspecified amount of monetary damages.

the cost of a AAA hearing room if requested.  *See Adamson v. Foulke Mgm't Corp.*, No. 08-4819, 2009 U.S. Dist. LEXIS 118061, *17 (D.N.J. Dec. 18, 2009) (discussing an affidavit from Gerald Strathmann, Vice-President of the AAA since January 2008, outlining the costs of an arbitration pursuant to AAA's Commercial Rules).  The average daily rate for an AAA Commercial Panel arbitrator in New Jersey is $1,684.16 and the costs range from $600 to $35,000.  *Id.*

Consequently, assuming fees and costs are split between the parties, Plaintiffs' portion of the filing fees ($17,550), the median amount of costs ($17,200), and an arbitrator's bill ($33,683.20 - assuming 20 days of work at $1,684.16 per day) could easily exceed $30,000.  Indeed, the class action rules provide for the selection of a panel of three arbitrators and the Commercial Rules Procedures for Large Complex Commericial Disputes provide that unless the parties agree otherwise, AAA will utilize a three arbitrator panel when claims exceed $1,000,000. http://www.adr.org/sp.asp?id=22440#A3 at L2.  In that scenario, Plaintiffs' portion of the arbitrators' bill alone could easily exceed $60,000.[6]

---

[6] If this case is sent to arbitration, Plaintiffs reserve the right to challenge the conscionability of the arbitration provision if an arbitrator determines that it does not provide for class arbitration.  *Muhammad v. County Bank of Rehoboth Beach*, 912 A.2d 88, 100 (N.J. Aug. 9, 2006) (holding that a class action waiver in a consumer arbitration agreement renders that agreement unconscionable).

### 4.  The Federal Arbitration Act Requires that Cases be Stayed Pending Arbitration

Were this Court to grant Defendants' motion to enforce the arbitration clause, the case should be stayed not dismissed.  The Federal Arbitration Act requires that courts "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . "  9 U.S.C. § 3.  The Third Circuit has held that the FAA's stay provision is mandatory, and there is no discretion vested in the district courts to deny the stay.  *Lloyd v. Hovensa, LLC*, 369 F.3d 263, 269 (3d Cir. 2004).[7]

### B.  Plaintiffs' Claims Should Not Be Dismissed

### 1.  Legal Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds that plaintiff has failed to set forth fair notice of what the claim is and the grounds upon which it rests.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  A complaint will survive a motion to dismiss if it contains

---

[7] Staying the case will also protect the rights of the unnamed class members for whom the statute of limitations was tolled by the filing of this action.  *See American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 550 (1974).

sufficient factual matter to "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570).   Plaintiffs have sufficiently pleaded claims that are plausible on their face.

> **2.     Named Plaintiffs Have Standing To Bring These
> Class Action Claims Against All Defendants
> Under the Concerted Action and Juridical Link
> Doctrines**

As a threshold matter, standing is a prerequisite for the maintenance of all actions, including class actions.  *Osgood v. Harrah's Entm't, Inc.*, 202 F.R.D. 115, 120 (D.N.J. 2001) (citing *Fallick v. Nationwide Mutual Ins. Co.*, 162 F.3d 410, 423 (6th Cir. 1998)); *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974).  However, there is no additional standing requirement for a plaintiff who seeks to represent a class.[8]   *Osgood*, 202 F.R.D. at 120-121 (citing *O'Shea*, 414 U.S. at 494).   Once an individual has alleged a distinct and palpable injury to himself, he has standing to challenge a practice even if the

---

[8] "Although it is the duty of the plaintiff to 'clearly and specifically set forth facts sufficient to satisfy [the] standing requirements,' the level of specificity necessary to avoid dismissal for lack of standing should not be 'exaggerated.'"  *Clark v. McDonald's Corp.*, 213 F.R.D. 198, 206 (D.N.J. 2003) (quoting *Hosp. Council of W. Pa. v. City of Pittsburgh*, 949 F.2d 83, 86-87, 88 (3d Cir. 1991)).  At this stage of the litigation, "the court may 'presume that the general allegations in the complaint [as to standing] encompass the specific facts necessary to support those allegations.'"  *Id.* (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 102, 104 (1998)).  When, as here, a challenge to standing is made on the basis of the pleadings, "the court must 'accept as true all material allegations of the complaint, and . . . construe the complaint in favor of the complaining party.'"  *Id.* (quoting *Pennell v. City of San Jose*, 485 U.S. 1, 7 (1988)).

injury is of a sort shared by a large class of possible litigants. *Osgood*, 202 F.R.D. at 120-121, n.3 (quoting *Fallick*, 162 F.3d at 423). And once a plaintiff's standing has been established, whether s/he will be able to represent the putative class, including absent class members, depends solely on whether s/he is able to meet the additional criteria encompassed in Rule 23 of the Federal Rules of Civil Procedure. *Osgood*, 202 F.R.D. at 121 (quoting *Fallick*, 162 F.3d at 423).

Defendants apparently acknowledge that the named Plaintiffs have standing to sue ProAssurance Casualty Company. Def. Br. at 15-17. Defendants argue, however, that the claims against ProAssurance Corporation and ProAssurance Indemnity should be dismissed because the named Plaintiffs lack standing to bring claims against those defendant entities. Specifically, Defendants argue that the named Plaintiffs did not contract with ProAssurance Corporation or ProAssurance Indemnity and thus there is no "causal connection" between the injuries alleged in the Complaint and the actions of these two Defendants. Id. at 16-17. Defendants ignore the fact that this is a class action where the named Plaintiffs seek to represent a class of injured persons and have alleged that these three related Defendants acted in concert in their practice of overcharging physicians for ERPs. The class nature of the claim makes a

critical difference when considering Defendant's argument.

As explained below, Plaintiffs' standing to represent absent class members against ProAssurance Corporation and ProAssurance Indemnity rests on the well established concerted action and juridical link doctrines as articulated in the leading case of *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461 (9th Cir. 1973), and embraced by the Third Circuit in *Haas v. Pittsburgh Nat'l Bank*, 526 F.2d 1083 (3d Cir. 1975). In *La Mar*, plaintiff initiated an action for federal Truth-in-Lending violations against all pawnbrokers licensed by the State of Oregon even though plaintiff had only borrowed from one pawnbroker. The Court held that a plaintiff having a cause of action against a single defendant could not bring a class action against the single defendant and an *unrelated* group of defendants. *Id.* at 462 (emphasis added).[9]    However, the Court then laid out two critical exceptions to this rule:

> Obviously this position does not embrace situations in which all injuries are the result of a **conspiracy or concerted schemes** between the defendants at whose hands the class suffered injury. Nor is it intended to apply in instances in which all defendants are **juridically**

---

[9] The court described its holding as follows: "The . . . issue [in these] cases is whether a plaintiff having a cause of action against a single defendant can institute a class action against the single defendant and an **unrelated** group of defendants who have engaged in conduct closely similar to that of the single defendant on behalf of all those injured by all the defendants sought to be included in the defendant class. We hold that he cannot." *La Mar*, 489 F.2d at 462 (emphasis added).

> **related** in a manner that suggests a single resolution of
> the dispute would be expeditious.

*Id.* at 466 (emphasis added).

The Third Circuit in *Haas v. Pittsburgh Nat'l Bank*, 526 F.2d 1083 (3d Cir. 1975), approved the concerted action and juridical link concepts set forth in *La Mar*.  In *Haas*, the district court had certified a plaintiff class in an action against multiple defendants, some of whom had never transacted business with the plaintiff, but who were all alleged to have acted in the same manner with respect to unnamed members of the plaintiff class.  *Haas v. Pittsburgh Nat'l Bank*, 60 F.R.D. 604, 611-14 (W.D. Pa. 1973).  After the Ninth Circuit issued its 1973 decision in *La Mar*, however, the district court reconsidered its class certification decision and concluded that class certification had been improper as against one of the defendants.  *Haas v. Pittsburgh Nat'l Bank*, 381 F. Supp. 801, 807-808 (W.D. Pa. 1974).  On appeal, the Third Circuit concluded that one of the plaintiffs did not have standing against one of the defendants on one of the issues.  526 F.2d at 1087.  However, the Third Circuit held that even though the plaintiff did not have standing against one of the defendants, summary judgment was inappropriate if the plaintiff could represent a class of plaintiffs who did have standing.  *Id.* at 1087 (citing Rule 23(a) of the Federal Rules of Civil Procedure).  The Third Circuit distinguished this scenario from *La Mar*

21

(where the named plaintiffs could assert no cause of action against certain named defendants and, as a result, those defendants were dismissed) and held that a plaintiff could assert a claim on behalf of a class against a particular defendant even though she lacked standing to assert that claim because she had standing to assert two other closely related direct claims against that defendant. *Id.* at 1089-90. The court also observed that in "situations in which all injuries are the result of a conspiracy or **concerted schemes** between the defendants at whose hands the class suffered injury" or in situations in which "all defendants are **juridically related** in a manner that suggests a single resolution of the dispute would be expeditious" a plaintiff with a claim against one defendant can represent a class of plaintiffs with claims against other defendants.[10] *Id.* at 1087 (citing *La Mar*, 489 F.2d at 466) (emphasis added). When the concerted action and juridical link doctrines of *Haas* and *La Mar* are applied to the case at bar, it compels the conclusion that Plaintiffs have standing to bring a class action suit against ProAssurance Corporation, ProAssurance Casualty and ProAssurance Indemnity.

---

[10] *See also Follette v. Vitanza*, 658 F. Supp. 492, 507-08 (N.D.N.Y. 1987) (Examples of such [juridical] links include partnerships or joint enterprises, conspiracy, and aiding and abetting, since these terms denote some form of relationship or activity on the part of the members of the proposed defendant class that warrants imposition of joint liability against the group even though the plaintiff may have dealt primarily with a single member) (internal quotations and citations omitted)).

### a. Defendants Engaged in a Concerted Scheme to Wrongfully Overcharge Former Policyholders for ERPs

Plaintiffs allege that all three Defendants market and sell ERPs under the same company name: "ProAssurance," that ProAssurance Corporation directs ProAssurance Casualty and ProAssurance Indemnity, that ProAssurance Casualty and ProAssurance Indemnity are ProAssurance Corporation's two largest subsidiaries, and that ProAssurance Casualty and ProAssurance Indemnity apply a common policy with respect to ERP premiums as dictated by ProAssurance Corporation.  Complaint ¶¶ 15-18.  Thus, Plaintiffs have alleged a concerted scheme amongst juridically linked Defendants to overcharge policy holders for an ERP endorsement.

This case is only in the initial stages and no discovery has been conducted.  In *Johnson  v. Geico*, 516 F. Supp 2d 351, 356 (D. Del. 2007) plaintiffs filed suit on behalf of themselves and all others similarly situated against GEICO Casualty Insurance Company, GEICO General Insurance Company, and GEICO Indemnity Insurance Company.  Defendants moved to dismiss plaintiffs' claims and argued that plaintiffs never purchased insurance coverage from either GEICO General or GEICO Casualty, and therefore, plaintiffs could not establish any compensable injury or damage.

*Id.* The court concluded that dismissal for lack of standing was not warranted at the pleading stage. *Id.* ("[D]iscovery on the issue of standing is warranted before the court entertains the question of whether GEICO General and GEICO Casualty should be dismissed from this action."). Accordingly, dismissal for lack of standing is not warranted at this stage of the case because discovery regarding the relationship between the Defendants as well as their concerted actions related to the scheme to overcharge former policy holders for ERP premiums is necessary.

> **b.    Defendants Are Juridically Linked in a Manner That Suggests a Single Resolution of the Dispute Would Be Expeditious**

Juridical links exist between ProAssurance Corporation, ProAssurance Casualty and ProAssurance Indemnity sufficient to establish the named Plaintiffs' standing to represent a class of persons with claims against the three related Defendants.    ProAssurance Corporation operates and writes medical malpractice insurance through its six consolidated subsidiaries, including ProAssurance Casualty and ProAssurance Indemnity. All three companies share common management and ProAssurance Corporation and Subsidiaries, including ProAssurance Casualty and ProAssurance Indemnity, file consolidated financial statements and reports. Ex. A (Excerpts from 2008 ProAssurance Annual Report). Similarly, in *Wu*

*v. MAMSI Life & Insur. Co.*, 256 F.R.D. 158, 165 (D. Md. 2008), the court considered whether the plaintiff, who filed a class action suit against her healthcare provider and its parent company, had standing to bring a claim against the parent company.  The court held that the plaintiff "clearly" had a relationship with the parent company sufficient to establish standing because she was a member of the subsidiary, alleged a direct injury caused by the parent, and alleged that the parent company uniformly directed its network of providers to defraud its members.  *Id.* at 167.

The close relationship between the Defendant parties provides a sound basis supporting application of the juridical links doctrine and makes clear that it would be inappropriate to dismiss Plaintiffs' claims at this stage of the litigation without allowing discovery.  *See Marchwinski v. Oliver Tyrone Corp.*, 81 F.R.D. 487, 489 (W.D. Pa. 1979) (permitting discovery on the question of certification of defendant class action after finding it likely that the "juridical link" exception to *Haas* would be met).

Plaintiffs' claims for relief are plausible on their face, including the allegations regarding the close relationship between the Defendants and the concerted plan to overcharge medical professionals for ERP endorsements. However, if the Court should nonetheless conclude that Plaintiffs have failed to meet the *Iqbal* standard, Plaintiffs should be permitted to take limited

discovery on this issue and should be granted leave to amend their complaint. Modest discovery is likely to permit an amendment that would clearly satisfy any *Iqbal* concerns. Additionally, Defendants are the only parties who have access to much of the evidence and should not be granted a dismissal without being subjected to the crucible of discovery on these factual issues.

> **3.    Defendants' Specific Requests for Dismissal of the Claims of Each of the Named Plaintiffs Based on Factual Assertions Are Inappropriate for Resolution on a Motion to Dismiss Prior to Discovery**

>> **a.    Plaintiff Emergency Physicians of St. Clare's Has Stated a Viable Claim**

Plaintiff St. Clare's alleges that the premium for its ERP endorsement should have been based on Defendants' 2004 rates, when the policy was written, but that ProAssurance charged St. Clare's the higher 2005 rate for new business. Complaint ¶¶ 44-47.

Defendants argue that there was no overcharge because their 2005 rate change did not "go into effect" until April 1, 2005, and that the effective rate was the same on December 31, 2004 and January 1, 2005. Def. Br. 14. Defendants support this argument with an April 20, 2005 letter from ProNational Insurance Company (the predecessor to ProAssurance Casualty), which on its face is irrelevant and should be ignored and excluded

by the Court. That letter says nothing about the "rates" or effective dates for "rates." It states: "I submit for your review and approval the revisions to the rules in the underwriting manual for the captioned program." Dinger Declaration, Ex. D. If the Court wishes to entertain a fact dispute at this juncture, then it should know that Plaintiffs contest Defendants' statement of fact on this issue. Attached as Exhibit B is a print out from Best State Rate Filings, an insurance filing commercial database, which shows that the ProAssurance rate change was filed as effective January 1, 2005, not April 2005 and that the April 1, 2005 filing related to "revised Rules," not rates. Attached as Exhibit C is a November 17, 2004 letter from ProNational Insurance Company to the New Jersey Division of Insurance and portions of the attachments to the letter showing that the revised fee schedule was submitted in November 2004 and was to be effective January 1, 2005. Indeed, the bottom of each page of the attachment that specifies rates says "Effective January 1, 2005."[11]

The April 20, 2005 letter, is outside of the pleadings, inappropriate for consideration on a motion to dismiss under FRCP 12(b), and should be

---

[11] It is also worth noting that a prior rate filing indicates that the ERP premium is to be calculated based on the premium charged for the policy being extended, not based on the premium for new business. See Ex. D, 2002 letter from ProNational Insurance Company to the New Jersey Department of Banking and Insurance (attached Explanatory Memorandum at 6).

excluded.  *See* Fed. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside of the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.").  However, should the Court decide to consider it and effectively convert this into a motion for summary judgment, Plaintiffs must be given an opportunity to conduct discovery on this issue.

### b.     Plaintiff Pascack Has Stated a Viable Claim

Defendants seek dismissal of Plaintiff Pascack's claim on the ground that ProAssurance Casualty applied the correct rate when it charged Pascack its 2004 rates because, *according to Defendants*, Plaintiffs claim that they should have been charged the rate in effect on the effective date of the ERP endorsement and Plaintiffs admit that the effective date was June 30, 2004. Def. Br. at 15.  However, Defendants have misstated the basis for Plaintiff Pascack's claim.  Pascack alleged that the rate was to "be computed in accordance with the rules, rates, rating plan and premiums applicable on the effective date of the endorsement," Complaint ¶ 40. The rules and rates in effect on June 30, 2004, made clear that the 2004 rates did not apply to Pascack's policy and related ERP because Pascack's policy originated in

2003 – not 2004.[12]   Accordingly, under the rules and filings, the applicable rate for the ERP endorsement must be calculated based on the rate in effect for the underlying policy, not on a rate for new business.

Defendants' argument for dismissal of Pascack fundamentally misses the core of Pascack's claim and should be rejected.   To the extent there are factual disputes or interpretation of ambiguous contract provisions, discovery must be allowed before a dispositive motion can be considered

### c.    Plaintiff Mercer Bucks Orthopedics' Claims are Timely

#### i.    The Statute of Limitations Did Not Begin to Run on October 30, 2003

Defendants argue that when Plaintiff Mercer Bucks received a "Notice of Right to Purchase the Extended Reporting Period Endorsement (Tail Coverage)" on October 30, 2003, it knew of the injury and the statute of limitations began to run.   Thus, they argue that the six-year statute of limitations expired approximately one month before Mercer Bucks filed its complaint on December 9, 2009.  Def. Br. at 13-14.  However, when Mercer Bucks knew or should have known that it was being overcharged is a factual inquiry that cannot be decided at this stage of the litigation.

---

[12] Defendants' rates and rules filing, effective January 1, 2004, stated that it **applied** to (1) new businesses incepting on or after January 1, 2004; (2) renewal businesses renewing on or after January 1, 2004; and (3) extended reporting period endorsements to policies incepting or renewing on or after January 1, 2004.  Complaint ¶ 40.

Merely sending a letter notifying a client of their opportunity to purchase an endorsement and mentioning the charge is neither a breach of contract nor sufficient to put a party on inquiry notice of wrongdoing.

The letter offer was merely advisory and no action was required or taken at the time Plaintiff received it. By its terms, Mercer Bucks had until January 30, 2004, to decide whether to purchase tail coverage, which they did by sending in payment on January 24, 2004, and letters signed by the physicians on December 30, 2003. The breach occurred when ProAssurance accepted a payment that violated the filed rates and contract, and failed to issue a refund. Mercer Bucks was not put on notice until they had reason to believe that they had been overcharged.

> ### ii.    The Statute of Limitations Does Not Begin to Run Until a Plaintiff Knew or Should Have Known of the Injury

Defendants concede that the statute of limitations for causes of action alleging fraud, breach of contract and accounting is six years from the time the action accrued. Def. Br. 13. *See also* N.J. Stat. Ann. § 2A:14-1. "A cause of action accrues when the plaintiff becomes 'aware of an injury and a causal relationship between the injury and an actor, but need not know that the conduct is tortious or legally wrongful.'" *Gillespie v. Janey*, 2010 U.S.

Dist. LEXIS 20041, at *12 (D.N.J. Mar. 5, 2010) (quoting *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group, Ltd.*, 181 F.3d 410, 425 (3d Cir. 1999)). "When the gist of the action is fraud concealed from the plaintiff, the statute begins to run on discovery of the wrong or facts that reasonably should lead the plaintiff to inquire into the fraud." *S. Cross Overseas Agencies*, 181 F.3d at 425 (citing N.J. Stat. Ann. § 2A:14-1 and *Lopez v. Sawyer*, 300 A.2d 563, 567 (1973)).  While the discovery rule typically is not applicable to breach of contract claims, the New Jersey Supreme Court has acknowledged that is applicable to a breach of contract claim where the breach is not obvious and detectable with reasonable diligence. *See County of Morris v. Fauver*, 707 A.2d 958, 972 (N.J. 1998).[13]

The "discovery rule" is an equitable principle adopted in New Jersey in *Fernandi v. Strully*, 173 A.2d 277 (N.J. 1961), whose purpose is to avoid harsh results that otherwise would flow from mechanical application of a statute of limitations.  *Kemp Indus. v. Saftey Light Corp.*, 1994 U.S. Dist. LEXIS 21466 (D.N.J. 1994), at *56 (quoting *Vispisiano v. Ashland Chemical Co.*, 527 A.2d 66, 72 (N.J. 1987)) (citations omitted).

---

[13] Defendants support their argument with a cite to only one case, *County of Morris v. Fauver,* Def. Br. at 13.  That case involved the interpretation of a statute – the New Jersey Contractual Liability Act, N.J.S.A. 59:13 – which has a specific provision as to notice and limitations.  That statute is not applicable to this case and the case is clearly distinguishable and not relevant to the issue at hand.  However, it did hold that the statute of limitations accrued at the time of payment, not the time a bill was submitted.

Under the discovery rule, a cause of action does not "accrue," for the purpose of the statute of limitations "until the plaintiff learns, or reasonably should learn, the existence of that state of facts which may equate in law with a cause of action." *Kemp Indus.*, 1994 U.S. Dist. LEXIS 21466, at *56 (quoting *Vispisiano*, 527 A.2d at 72); s*ee also Apgar v. Lederle Laboratories*, 588 A.2d 380 (N.J. 1991). Under the discovery rule, the six-year statute of limitations did not begin to run until Mercer Bucks knew or had reason to know that it was being overcharged for its ERP.

When there is a dispute about the applicability of the statute of limitation, "there are usually factual questions as to when a plaintiff discovered or should have discovered the elements of its cause of action." *S. Cross Overseas Agencies,* 181 F.3d at 425. Moreover, "[D]efendants bear a heavy burden in seeking to establish as a matter of law that the challenged claims are barred." *Id*. (quoting *Van Bursirk v. Carey Canadian Mines, Ltd.*, 760 F.2d 481, 498 (3d Cir. 1985)).

### iii.    Plaintiff Mercer Bucks Did Not Know or Have Reason To Know of the Wrongdoing in 2003

Mercer Bucks did not know or have reason to know on October 30, 2003 that ProAssurance Casualty was overcharging for its ERP. ProAssurance Casualty merely sent a letter enclosing a "Notice of Non-

renewal effective December 31, 2003" and a "Notice of Right to Purchase the Extended Reporting Period Endorsement (Tail Coverage)" ("ERP notice") for each doctor at Mercer Bucks.  Complaint ¶ 28, Ex. E.  Each ERP notice required Mercer Bucks to submit payment "within thirty (30) days following termination of the coverage (or thirty (30) days from the date of this letter, whichever is later)."  Ex. F.  Each ERP notice also disclosed the primary limits of the ERP and the premium or cost of the ERP.  Nothing in the letter required any action, analysis or payment before January 30, 2004.  Nor did anything in the letter notices even remotely suggest that the amount mentioned for each ERP endorsement was based on the 2004 rates for new business.  The return letters signed by the physician were all dated December 30, 2003.  Complaint ¶¶ 29, 30, Ex. F.

> Mercer Bucks' policy with ProAssurance states:
>
> ProNational will compute the additional premium for the extending reporting period endorsement in accordance with ProNational's rules in effect on the termination date.  The extended reporting period endorsement will be effective as of the termination date and will be for an unlimited time period thereafter….The extended reporting period endorsement is subject to the policy provisions.

Ex. G, Professional Liability Policy, at 6.  December 31, 2003 is the stated Effective Date on the ERP endorsement.  Ex. H.  Based on the actual policy language, Mercer Bucks had no reason to suspect or believe that the

premium for the ERP would be computed based on rates that would take effect for new business on January 1, 2004. Additionally, although the ERP notice was sent to Mercer Bucks on October 30, 2003, it could not and did not become effective until the policy termination date, December 31, 2003.

In short, Mercer Bucks had no reason to suspect on October 30, 2003, that any wrongdoing had occurred. ProAssurance does not contend that it informed Mercer Bucks that it was charging based on 2004 rates, not the rates in effect for the policy. ProAssurance does not point to anything that would have put Mercer Bucks on notice of the wrongdoing alleged. They merely sent a letter indicating pricing that would be charged when and if the tail was purchased and that the period to purchase extended until the end of January 2004.[14]

It is also important to note that the computation of the applicable rates is a highly complex process -- not immediately or easily determined by the Plaintiffs. Rate computations are based on many factors and vary by Physician, see e.g. Ex. C, thus the overcharges were in no way obvious or detectable with reasonable diligence.

---

[14] Contrary to Defendants' assertion that Mercer Bucks "concedes that on October 30, 2000, ProAssurance Casualty notified Mercer-Bucks that it could purchase an ERP endorsement at a rate that was allegedly higher than that provided for in Mercer-Bucks' policy," Def. Br. at 13(citing Complaint at ¶¶ 28, 30, 32-33), nothing in those paragraphs concedes that point.

Given the heavy burden that Defendants bear in seeking to establish as a matter of law that Mercer Bucks' claims are time-barred, it is clear on this record that Defendants have failed to overcome that burden and the motion to dismiss should be denied. If the Court intends to address the factual issue at this time, then it should allow discovery to proceed and grant Plaintiff leave to amend, should that be warranted.

## III.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to compel arbitration as well as Defendants' motion to dismiss. Should the Court determine that arbitration is appropriate for some or all of the claims asserted, this case should be stayed pending the outcome of the arbitration.

Dated:  March 29, 2010

/s/Eric Poe
Eric Poe, Esq.
214 Carnegie Center Blvd.
Suite 301
Princeton, NJ 08540
Telephone: (609) 520-3067
Fax: (866) 298-6341
Email: epoe@epoelaw.com

Of Counsel:

**Mehri & Skalet, PLLC**
Steven A. Skalet, Esq. (*pro hac vice*)
1250 Connecticut Avenue, NW
Suite 300
Washington, DC 20036
Telephone: (202) 822-5100
Fax: (202) 822-4997
Email: sskalet@findjustice.com

**Gary D. McCallister & Associates, LLC**
Gary D. McCallister, Esq.
(*pro hac vice*)
Jamie Goldstein, Esq. (*pro hac vice*)
120 North LaSalle Street
Chicago, IL 60602
Telephone: (312) 345-0611
Fax: (312) 345-0612
Email: gdm@gdmlawfirm.com
        jgoldstein@gdmlawfirm.com


*Attorneys for Plaintiffs*